# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | )  4:99cr71·RH |
| | ) Case No.: 4:99m130 |
| Plaintiff, | ) |
| | ) Tallahassee, Florida |
| vs. | ) October 1, 1999 |
| | ) 3 P.M. |
| LAWRENCE LOMBARDI, | ) |
| | ) |
| Defendant. | ) |

59 OCT 14  AM 9: 36

## TRANSCRIPT OF FIRST APPEARANCE
## BEFORE THE HONORABLE WILLIAM SHERRILL
## UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:      P. Michael Patterson
                        United States Attorney
                        By:  RICHARD S. GLASER, JR.
                             Assistant U.S. Attorney
                        315 South Calhoun Street, Suite 510
                        Tallahassee, Florida  32301-1841

For the Defendant:      R. TIMOTHY JANSEN
                        Attorney at Law
                        610 North Duval Street
                        Tallahassee, Florida   32301

Court Reporter:         Judy A. Ellan, RPR
                        Official U.S. Court Reporter

— 10—

| 1 | $P \underline{R} \underline{O} \underline{C} \underline{E} \underline{E} \underline{D} \underline{I} \underline{N} \underline{G} \underline{S}$ |

1                     P R O C E E D I N G S

2        (Call to Order of the Court.)

3        (Defendant present.)

4            THE COURT: Be seated, please.

5            I have for first appearance United States versus

6 Lawrence Lombardi. It's Case 4:99m130.

7            This is a first appearance, Mr. Lombardi, and I'm a

8 United States Magistrate Judge. The purpose is to advise you

9 of the nature of the charges against you, to consider the

10 question of release and conditions of release, and to be sure

11 you have a lawyer to represent you.

12            First, do you have a copy of the complaint?

13            MR. JANSEN: Judge, on behalf of Mr. Lombardi, I

14 have read the entire complaint with him. We would waive any

15 more formal reading of the complaint. We would enter a not

16 guilty, and we would ask he be released on bond.

17            THE COURT: All right. The nature of the charge

18 against you is knowingly and intentionally receiving,

19 possessing and making a firearm, which is not registered to

20 you in the National Firearms Registration and Transfer

21 Record. That's alleged to be in violation of 26, United

22 States Code, Section 5861(d) and (f).

23            The maximum potential penalty, should you be found

24 guilty, is a sentence of ten years of imprisonment, a fine of

25 $250,000, and at least three years -- and three years of

1    supervised release.  That's as to each of the two counts.

2            You carry with you the right to remain silent, and

3    that's one of the things that I'm going to tell you about at

4    the first appearance.  Anything that you say to anyone, other

5    than your lawyer, can be held against you.  If you've made

6    any statements before you came in here today and now you want

7    to be silent, you've got the right to do that.  If at any

8    point you want to answer questions, you've got a right to

9    have your lawyer with you while you are questioned.  During

10   the questioning, if you want to go talk privately with your

11   lawyer, you can do that.  At any time that you're speaking,

12   you've got a right to remain silent; that is, you can stop

13   speaking, and there's no penalty for exercising that right.

14           The point of all of this is, the government has got

15   to prove what they've alleged beyond a reasonable doubt, and

16   they can't ask questions of you or point to you and say that

17   you are guilty because you're sitting silently.

18           The second right that I explain to you at a first

19   appearance is your right to counsel.  You have a right to

20   have a free court-appointed lawyer, if you can't afford one.

21   You have a right to hire a lawyer, if you or family and

22   friends want to do that.  Your right to counsel includes the

23   right to have a lawyer to protect your interest throughout

24   the processing of this case; to be present on your request,

25   if you want a lawyer present when you're questioned; and,

```
 1    thirdly, if the authorities seek to place you in a lineup to

 2    try to have a witness identify you from an array of other

 3    people, you would have the right to have counsel present at

 4    that time as well.

 5          Mr. Jansen, you've informed me that you're

 6    temporarily retained today.

 7          MR. JANSEN:  Judge, I'm in the process of being

 8    retained by the family.  I'm in communication with the

 9    family.  I would ask the Court to allow me some time, seven

10    days, in order for that to take place.

11          THE COURT:  All right.

12          Mr. Lombardi, that's my normal practice where the

13    arrangements for counsel have not been made completely.  So,

14    what you must do is, you must make a decision whether you are

15    going to hire Mr. Jansen or not; and, if you decide you

16    cannot afford to hire Mr. Jansen, we'll give you the form to

17    fill out, and I need to have that back in seven days.  If you

18    qualify, I'll appoint the public defender.  And, if

19    Mr. Jansen is retained, of course, he will enter an

20    appearance.

21          The next thing to tell you is that this is pending

22    on what's known as a "Criminal Complaint."  It's not an

23    indictment.  You've got a right to what's known as a

24    "probable cause hearing" -- it's formally called a

25    "preliminary hearing" -- to determine whether it's more
```

| | |
|---|---|
| 1 | probable than not that what's alleged to have occurred in |
| 2 | this complaint is true.  The government has to put on that |
| 3 | probable cause evidence, and you've got a right to have your |
| 4 | attorney there.  You've got a right to challenge the evidence |
| 5 | and contest probable cause. |
| 6 | And, finally, you've got a right to consideration of |
| 7 | release and conditions of release, and that's the last thing |
| 8 | that I'm to consider here today. |
| 9 | As I always do, is the government seeking detention? |
| 10 | MR. GLASER:  Yes, Your Honor, based on danger to the |
| 11 | community.  The allegations here, Your Honor, very briefly, |
| 12 | as the Court may -- |
| 13 | THE COURT:  Let me stop us here.  Is everybody ready |
| 14 | for a hearing on the question of detention? |
| 15 | MR. JANSEN:  Judge, we are ready to proceed, and we |
| 16 | would object to a proffer.  We would ask the Court, because |
| 17 | of the nature of the charges and the circumstantial |
| 18 | statements in the criminal complaint -- this is not an |
| 19 | indictment, so there's no probable cause -- I would ask that |
| 20 | the agent testify, and we be allowed to cross-examine him. |
| 21 | THE COURT:  Well, if we're going to have a hearing |
| 22 | right now on the issue of the government's motion for |
| 23 | detention, we will do a preliminary hearing, too. |
| 24 | And what the government can do is, the government |
| 25 | can adopt the affidavit, and then I'll allow |

1    cross-examination of Agent Pellegrino.

2              MR. GLASER:  Thank you, Your Honor.

3              THE COURT:  I think that's the simpler way to go at

4    it.

5              MR. GLASER:  That would be fine with the United

6    States, Your Honor.  As the Court is well aware and has

7    viewed the affidavit, at least on two different occasions

8    now, you are well aware of what the United States would put

9    forward in that affidavit concerning the two bombings, August

10   31st and September 22nd; and the racially-charged language

11   and threats involved as well that are included that tie

12   directly to the defendant, Mr. Lombardi.

13             We are prepared to proffer that affidavit as

14   evidence to detain Mr. Lombardi for purposes of him being a

15   danger to the community, and we would offer Special Agent

16   Pellegrino up for cross-examination.

17             THE COURT:  All right.  Come on up.

18             Since I'm taking up the affidavit, I'll take up the

19   probable cause at this point for preliminary hearing, and I

20   have distributed to both parties the pretrial services

21   report, and that also I'll consider on the motion for

22   detention.

23             MR. GLASER:  Your Honor, I don't mean to go out of

24   order, but I do have a few comments about the pretrial

25   services report when the Court would allow.

```
1              THE COURT:  Okay.

2              DEPUTY CLERK:  Raise your right hand.

3      MATTHEW M. PELLEGRINO, GOVERNMENT WITNESS, DULY SWORN

4              DEPUTY CLERK:  Be seated.

5              State your full name and spell your last name for

6  the record.

7              THE WITNESS:  Matthew M. Pellegrino,

8  P-E-L-L-E-G-R-I-N-O.

9              THE COURT:  I think you need to have Agent

10  Pellegrino acknowledge that he signed this affidavit before

11  we get started.

12             MR. GLASER:  Be happy to.

13                      DIRECT EXAMINATION

14  BY MR. GLASER:

15  Q.  Special Agent Pellegrino, on October 1, 1999, did you

16  sign an affidavit appended to a criminal complaint presented

17  to Magistrate Judge Sherrill, who is sitting on the bench

18  here today?

19  A.  Yes, sir, I did.

20  Q.  And in that did you attest before the Magistrate Judge to

21  the truthfulness and veracity of any and all statements

22  included in this affidavit?

23  A.  Yes, sir.

24  Q.  And to the best of your knowledge, as you sit there

25  today -- do you have a copy of the affidavit in front of you?
```

1   A.   Yes, I do.

2   Q.   To the best of your knowledge, is what is included, as

3   you sit there today, true and accurate?

4   A.   Yes, it is.

5            MR. GLASER:   Your Honor, that's all of the questions

6   I have.

7            THE COURT:   Okay.   Cross?

8            MR. JANSEN:   Thank you, Your Honor.

9                      **CROSS-EXAMINATION**

10  BY MR. JANSEN:

11  Q.   Agent Pellegrino, did you write this affidavit yourself,

12  or did someone else assist you?

13  A.   I had assistance.

14  Q.   Okay.   And did you personally observe all of the

15  information that you put in here, or did you rely on

16  conversations from other persons or other agents?

17  A.   I observed all of the information in this affidavit that

18  I have read several times.   So, I certainly observed the

19  information.   I relied on information from other

20  investigators assigned the case, as well.

21  Q.   Is it fair to say that you, yourself, did not interview

22  all of the persons who allegedly were interviewed?

23  A.   Oh, absolutely; that's correct.

24  Q.   Okay.   Is it fair to say that this pipe that you describe

25  that was purchased from Home Depot, is that a -- that's

```
 1   professional and it's for irrigation purposes, is it not?
 2   A.   Are you referring to the --
 3   Q.   I'll refer to your paragraph.
 4   A.   That would be helpful.
 5   Q.   Paragraph Number 4, sir, of your affidavit, and I would
 6   ask you to look at, I guess, the latter part of that
 7   paragraph.  You indicate that there were 80 sales of this
 8   type of device on August 24th, 1999; is that correct?
 9   A.   Did I hear you say 80 sales?
10   Q.   Well, let me say this:
11        How many other of this one type of pipe, this PVC and
12   cap, were bought on August 24?
13   A.   Okay.  Let me make sure I understand your question.
14   You're asking how many of these pipes and caps were bought on
15   August 24th; is that correct?
16   Q.   Right.
17   A.   Okay.  I haven't found that spot yet.  Hang on a second.
18        My recollection and my affidavit states that there was
19   only one other instance of a sale of that type of
20   merchandise -- that is, the PVC end caps and PVC ten-inch
21   Schedule 80 -- correction -- Schedule 80 PVC pipe -- on
22   August 24th.  That was the only sale, in addition to the one
23   on the 30th of August.
24   Q.   Is it fair to say that the purchaser of that same type of
25   device on August 24th could also have built a similar device
```

1   that the FBI presumed was made?

2   A.  It's very unlikely.  In that investigation, we identified

3   who that individual was, and that person still had the items

4   that he purchased.

5   Q.  All right.  How far back did you go in looking for these

6   items?  Did you have a specific target date of 30 days or --

7   A.  I do not recall exactly how far the investigators who

8   were assigned that particular lead went back.

9   Q.  Is it also fair to say that, based on the next sentence

10  in that paragraph, that this is used in commercial well and

11  irrigation applications?

12  A.  Yes, sir; that is correct.

13  Q.  And is it fair to say that any of these items could have

14  been purchased a year or six months prior to the August 31st

15  bombing?

16  A.  The items that I mentioned in my affidavit?

17  Q.  Well, a similar type item could have been purchased six

18  months earlier?

19  A.  Is that possible?  Certainly, it's possible.

20  Q.  And based on the evidence that the FBI has uncovered, do

21  they know exactly when this device was put together?

22  A.  No, sir.

23  Q.  And they can't do that scientific evidence, can they?

24  A.  Not to my knowledge.

25  Q.  Okay.  And when you interviewed Mr. Lombardi at his home,

 1 | did he also tell you that he was doing some irrigation work
 2 | in his yard?
 3 | A.  He was trying to improvise a sprinkler.
 4 | Q.  Improvise?
 5 | A.  Yes, sir.  In other words, trying to built it himself.
 6 | As opposed to purchasing the sprinkler, he tried to make one.
 7 | Q.  Did you see anything in the yard that would confirm that?
 8 | A.  Well, it was dark out.  He was pointing to an area in his
 9 | lawn that he said required extra gardening.  I didn't really
10 | examine it very closely.
11 | Q.  Can you tell us why you didn't follow that lead?
12 | A.  It was dark.  I couldn't see it.
13 | Q.  Is anybody checking into that now?
14 | A.  As we stand here right now?  I don't know, sir.
15 | Q.  Have you looked at all of the PVC purchases from Lowe's
16 | and every other store in the community?
17 | A.  The investigation focused in on Schedule 80 PVC --
18 | Q.  Okay.
19 | A.  -- insofar as that is a much more rare type of PVC to
20 | use.  The standard used by most people is the familiar
21 | Schedule 40, which is that white PVC.  Schedule 80 is much
22 | more heavy-duty and much more expensive; and, therefore, the
23 | Schedule 40 is more commonly used.  Schedule 80 is much more
24 | rare.
25 | Q.  Well, my questions is:  Does Lowe's sell Schedule 80?

```
 1    A.  Yes, it does.

 2    Q.  Did you do anything to interview the persons who bought

 3    this Schedule 80 during the month of August?

 4    A.  Yes, sir.  A certain period of time was established; and,

 5    as I mentioned before, I'm not sure exactly what that period

 6    of time was as I sit here right now; but, during the certain

 7    period of time, two purchases were identified.

 8    Q.  From Lowe's?

 9    A.  From Lowe's.

10    Q.  Similar type device?

11    A.  That's correct.

12    Q.  And did you investigate those persons?

13    A.  Yes.

14    Q.  All right.  And do you know -- are there any other

15    hardware stores that would sell this Schedule 80?

16    A.  Hardware stores, I don't believe so.  We went to the

17    manufacturer and identified the distributors and attempted to

18    trace distributors or those stores that carried it in the

19    Tallahassee area.  These were the only sales that we were

20    able to identify in that specified period of time, which,

21    again, I don't recall off the top of my head what exactly

22    that period was.

23    Q.  Okay.  Is it fair to say then that you didn't look in the

24    outlying counties, like Wakulla?

25    A.  Oh, yes, sir, we did.
```

1   Q.  Oh, you did?

2   A.  Yes, sir.

3   Q.  Okay.  There is no prohibition from someone purchasing

4   this from a store in Tampa or Jacksonville, is there?

5   A.  Prohibition?

6   Q.  Well, it could be purchased there, correct?

7   A.  If it was carried, certainly.

8   Q.  All right.  You, yourself, are not an explosives expert,

9   are you?

10  A.  Expert, no, sir, I wouldn't say so.

11  Q.  And so when you relied on whether something is similar,

12  you were relying on experts in the field?  Some of your

13  affidavit states that these devices and parts that were found

14  were similar to the purchase.

15  A.  Those were laboratory experts that provided that

16  information.

17  Q.  Is it fair to say that they are still doing some tests to

18  determine a hundred percent accuracy whether or not that

19  device was utilized?

20  A.  The evidence is still being examined; yes, sir.

21  Q.  And, in fact, some of the evidence may prove not to be

22  the device; is that possible?

23          MR. GLASER:  Objection, speculation, Your Honor.

24  BY MR. JANSEN:

25  Q.  Is it possible?

```
 1              THE COURT:  You may inquire.

 2   BY MR. JANSEN:

 3   Q.  Is it possible?

 4              THE COURT:  You may answer.

 5              THE WITNESS:  Anything is possible.

 6   BY MR. JANSEN:

 7   Q.  And by my earlier question, this device -- these devices

 8   that exploded at FAMU may have been put together years ago.

 9   Isn't that possible?

10   A.  I would really have no way of knowing; but, again,

11   anything is possible.

12   Q.  Is it fair to say that you don't have any eyewitness

13   putting Mr. Lombardi putting together these pieces and making

14   the bomb?

15              MR. GLASER:  Objection.

16              THE COURT:  Overruled.

17              THE WITNESS:  No, sir, I do not have anyone who's

18   reported observing Mr. Lombardi constructing the device.

19   BY MR. JANSEN:

20   Q.  Do you have any eyewitness putting Mr. Lombardi at FAMU

21   and the location where the bombs exploded on August 31st or

22   on September 22nd?

23   A.  No, sir, but he has been linked to other sites related to

24   this crime.

25   Q.  So the answer is, no; isn't that correct?  There are no
```

1    eyewitnesses placing him at the scene of the crime?

2    A.   Well, the scene -- there were several scenes of the

3    crime.  No, your -- the answer to the question as to whether

4    he was there at FAMU, no, sir, I have not placed him at that

5    scene; however, I have placed him at other scenes.

6    Q.   All right.  He's charged with building a device that's

7    not registered with the National Firearms; is that correct?

8    A.   Yes.

9    Q.   Do you have any witnesses showing him building that item?

10   A.   No, sir.

11   Q.   And is it fair to say that a lot of your affidavit

12   contains persons seeing my client around the community of

13   Tallahassee?

14   A.   I'm not sure I understand "a lot."  He has been seen at

15   various locations that were of interest to this

16   investigation; yes, sir.

17   Q.   And not one person sighted him on FAMU campus, during all

18   of the different sightings you've listed in your affidavit?

19            MR. GLASER:  Your Honor, is he referring to persons

20   in the affidavit?

21            MR. JANSEN:  Whatever his case is, Judge.  I don't

22   know if he has something outside of the affidavit that he

23   would like to share with the Court.

24            THE COURT:  Well, since you're questioning him on

25   the affidavit, it is important that you distinguish between

| | |
|---|---|
| 1 | either one, but you are entitled to inquire. |
| 2 | BY MR. JANSEN: |
| 3 | Q.  Paragraphs 1 through 26, there is not one person in this |
| 4 | community that has been identified linking or seeing him at |
| 5 | FAMU campus on either day? |
| 6 | A.  I have not yet identified anyone seeing him on the FAMU |
| 7 | campus as of yet during this particular period of time. |
| 8 | Q.  Now, you have identified his vehicle, also; some people |
| 9 | have identified his vehicle; namely, in Paragraph Number 8 of |
| 10 | the affidavit; is that correct? |
| 11 | A.  Would you repeat the question again? |
| 12 | Q.  You identified a vehicle, a Chevy S-10 pickup.  Is that |
| 13 | the vehicle my client drives, do you know, registered to him? |
| 14 | A.  He has a Chevy S-10 vehicle; yes, sir. |
| 15 | Q.  Again, all of your paragraphs, 1 through 26, there is not |
| 16 | one citizen who places that vehicle on FAMU campus on August |
| 17 | 31st or September 22nd, do you? |
| 18 | A.  I have not located anyone who has reported that yet; no, |
| 19 | sir. |
| 20 | Q.  Okay.  I understand that Channel 27 may have recorded |
| 21 | various conversations based on your affidavit; is that |
| 22 | correct? |
| 23 | A.  That's correct. |
| 24 | Q.  Did Mr. Lombardi ever identify himself to Channel 27? |
| 25 | Was he identified by -- |

1    A.   Did he identify himself to the recipient of the telephone

2    call at Channel 27?

3    Q.   Right.

4    A.   No, sir.

5    Q.   Was there any trace-back calls to his home?

6    A.   To his home?

7    Q.   Right.

8    A.   No, sir.

9    Q.   Okay.

10   A.   Not that I know of; no, sir.

11   Q.   Channel 27, somebody pushed Star 69, traced back to

12   various locations, correct?

13   A.   That's correct.

14   Q.   None of those locations were his home, were they?

15   A.   No, sir.

16   Q.   And part of these transcripts -- are these complete, or

17   were some of those phone calls not completely taped, only

18   portions of them taped?

19   A.   Which transcript are you talking about?

20   Q.   With Mr. Roberts.  We'll start with the first

21   conversation.  Was that a full and complete conversation?

22   A.   The first conversation on August the 31st or --

23   Q.   Yes.

24   A.   -- September 22nd?

25   Q.   Let's start with the 31st.

| | |
|---|---|
| 1 | A. Okay. That conversation was not recorded, sir. |
| 2 | Q. Do you know how long that phone conversation took place? |
| 3 | How long the call was? |
| 4 | A. How long the call -- from Mr. Roberts' description, notes |
| 5 | and recollection, just several minutes. |
| 6 | Q. Okay. And is it fair to say then that Mr. Roberts has |
| 7 | not been able to compare the first call to the second call to |
| 8 | clearly see if they are both the same person? You haven't |
| 9 | been able to sit down with both calls, since the first one |
| 10 | wasn't taped, right? |
| 11 | A. Mr. Roberts has his own recollections, and he had told me |
| 12 | what his recollections were in comparison with those voices |
| 13 | and told me he believed them to be the same. |
| 14 | Q. And I understand you put that in your report, and he's |
| 15 | relying on a two-minute conversation out of the blue, which |
| 16 | was not recorded, with a later conversation almost a month |
| 17 | later. And how long was that conversation? |
| 18 | A. Again, you're talking about that conversation, the -- |
| 19 | Q. The second conversation. |
| 20 | A. The first conversation on January -- correction -- |
| 21 | September 22nd? |
| 22 | Q. Yes. How long was that, approximately? |
| 23 | A. Again, just a couple of minutes. |
| 24 | Q. Was that tape-recorded? |
| 25 | A. Partially. |

1   Q.  What part was not recorded, beginning or after?

2   A.  The beginning.  By the time he realized it was a call of

3   some interest, some investigative interest, he activated the

4   recording and just got the end of the conversation.

5   Q.  Have you interviewed Mr. Roberts?

6   A.  Yes.

7   Q.  Does he have any personal familiarity with Mr. Lombardi?

8   A.  Not that I know of; no, sir.

9   Q.  So, he certainly hasn't had a previous conversation which

10  he can clarify and say, "Yeah, that's Mr. Lombardi's voice,"

11  to your knowledge?

12  A.  Not to my knowledge; no, sir.

13  Q.  And can you tell me how many other calls were made to any

14  TV station or any newspaper in the community after the

15  bombing in which somebody may have made another threat, made

16  another comment regarding the bombing?  Do you understand my

17  question?

18  A.  I'm a little bit confused.  No, sir.

19  Q.  As a result of the original event on August 31st, did

20  anyone in this community -- any other newspaper, television

21  station -- receive a call from someone, a citizen, making

22  similar statements or making comments about what had

23  transpired?

24  A.  Yes, sir, I believe so.

25  Q.  And how many other persons had called in?  How many other

1   calls were there of that nature?

2   A.   I really don't have any idea how many bomb threats were

3   received in the city after that period of time.

4   Q.   Well, is it fair to say that the FBI Task Force started

5   their investigation on August 31st?

6   A.   Yes, that's a fair statement; yes, sir.

7   Q.   And is it fair to say that some representative from the

8   federal government, either ATF or your office, contacted all

9   of the news station bureaus and had them keep a lookout or

10  tape any calls that might be related?

11  A.   I'm not sure it was quite that formal; but, essentially,

12  that occurred; yes, sir.

13  Q.   And you are telling this Court that there were other

14  calls in the community regarding this event or these events

15  that are not listed in here?

16  A.   Regarding these events?

17  Q.   Regarding the bombings.

18  A.   If someone has called in and mentioned a bombing?   Is

19  that the question?

20  Q.   What I mean is someone that may have called in with

21  similar type of statements, innuendo, or negative comments

22  about the bombing or the persons at FAMU?

23  A.   I have -- I'm aware of a couple of calls, but is that the

24  entire limit of calls?  I have no way of knowing.  Again, I'm

25  not -- I don't have a direct key into the dispatch in the 911

```
 1   operators, so I'm not sure exactly how many might have come

 2   in.

 3   Q.   That's fair to say.  But you are the lead agent on this

 4   case?

 5   A.   Yes, sir, one of them; yes, sir.

 6   Q.   And you became aware that there might be some other

 7   calls.  Did you follow those up?

 8   A.   Certainly, yes, sir.

 9   Q.   All right.  And was Mr. Roberts the recipient of those

10   calls?

11   A.   The two calls that I know about, no, sir, he was not.

12   Q.   Do you know who else was called, or at least can you tell

13   us what --

14   A.   I do not -- as I sit here today, I don't recall the

15   names, but I know of two calls that were received.  One was

16   received by Channel 27 by a person other than Mr. Roberts,

17   and then --

18   Q.   Okay.

19   A.   -- there was a second call to The Tallahassee Democrat

20   that I became aware of.

21   Q.   And have you tried to connect Mr. Lombardi to those

22   calls?

23   A.   Investigation is taking place looking at those calls to

24   identify the caller.  I'm not trying to link it to anyone.

25   I'm trying to find out who the caller was.
```

1   Q.   That's fair to say.  But based on your affidavit, if you

2   clearly had any evidence showing Mr. Lombardi made those

3   calls, you would have placed that in this affidavit; is that

4   correct?

5   A.   If Mr. Lombardi was identified as the caller?  He has not

6   been identified as the caller in those two calls; that's

7   correct.

8   Q.   Could you tell this Court the general nature, without any

9   inflammatory words, of those two calls?

10  A.   The first one was a bomb threat to the Leon County Civic

11  Center.  The second -- let me see how I can characterize

12  that.

13       Again, I did not interview the individual who received

14  this call; but, to the best of my knowledge, the call

15  indicated that other events may take place at -- or other

16  events were planned to take place at the FAMU campus.

17  Q.   All right.  It's possible that there are other people in

18  this community who are planning events against FAMU?

19  A.   As I said before, anything is possible.  I don't have any

20  information that that is, in fact, going on at this point,

21  but, you know, it's possible.

22  Q.   Now, the one call to the civic center, was there any

23  racial statements incorporated in that, what I mean, that

24  could have linked it to the same thing at FAMU?

25  A.   Racial statements?  I think there was a mention of FAMU

1   in that -- something to the effect, "FAMU wasn't anything,"

2   or something like --

3   Q.  Okay.

4   A.  I don't recall specifically, but memory serves me that

5   FAMU was mentioned.

6   Q.  All right.  And you, yourself, have you investigated any

7   kind of events, any terroristic events in your history as an

8   FBI agent?

9   A.  I am assigned terrorism matters; yes, sir.

10  Q.  And are you aware, in your experience, that when some of

11  these occasions occur, that persons who are not related to

12  the event call and take credit for these events?

13  A.  Call and take credit?

14  Q.  Call a newspaper and claim responsibility.

15  A.  Yes, sir, that has happened, sure.

16  Q.  And merely calling and making innuendo or taking credit

17  for a crime which you didn't commit, is not necessarily a

18  violation of what he's charged with, is it?

19  A.  Taking credit?

20  Q.  Or calling up and making any improper statements, however

21  they may be conveyed.

22  A.  I'm not sure I'm in a position to make a legal conclusion

23  as to whether such acts were illegal or not, without getting

24  the whole story.

25  Q.  Okay.  Did you tell my client that the phone call itself,

| 1  | if you did make a phone call, would not be a crime? |
|----|-----|
| 2  | A. In our interview that we had last night and this morning, |
| 3  | we were talking about the fact that expressing his opinion |
| 4  | about certain things was not a crime. |
| 5  | Q. And when you asked him did he do this crime, he denied |
| 6  | it, did he not? |
| 7  | A. He denied setting the bombs at Florida A&M; yes, sir. |
| 8  | Q. He denied even making any kind of a device, did he not? |
| 9  | A. Yes, sir. Not in those specific words, but he intimated |
| 10 | that he did not. |
| 11 | Q. At that point he asked for an attorney; is that correct? |
| 12 | A. At one point he asked for an attorney. |
| 13 | Q. How many hours was he under interview before he asked for |
| 14 | an attorney? |
| 15 | A. I suppose we talked for a couple of hours. |
| 16 | Q. Three to four hours? |
| 17 | A. I was thinking more like three hours. |
| 18 | Q. And can you tell the Court what time of night that |
| 19 | occurred? |
| 20 | A. Oh, it began quite late. About 12:30 or so. |
| 21 | Q. All right. Can you describe the scene when you and your |
| 22 | officers showed up at the search warrant? |
| 23 | MR. GLASER: Your Honor, I'm not real clear on where |
| 24 | this is going or the relevance of it. |
| 25 | THE COURT: Me neither. |

1    |          MR. JANSEN:  Well, Judge, I think statements were
2    | made that they are putting in this affidavit.  I think the
3    | Court has a responsibility to understand the circumstances
4    | under which any statement by my client was made and what
5    | effect should be given because of those circumstances.  If
6    | they want to take out that part of the affidavit, that's
7    | fine.
8    |          MR. GLASER:  Your Honor, the defendant can get up on
9    | the stand and deny he made the statements.  If there's a
10   | diminished capacity defense here, that can be made at the
11   | proper time.
12   |          THE COURT:  The only statements are to the tail end
13   | of the affidavit.
14   |          MR. JANSEN:  That's correct, Your Honor.  My client
15   | has no responsibility to prove anything, Judge, and I'm sure
16   | counsel knows that.
17   |          THE COURT:  Certainly, that is true.  I'll let you
18   | go ahead --
19   | BY MR. JANSEN:
20   | Q.  Is it fair to say that --
21   |          THE COURT:  -- and inquire.  There is no need to go
22   | extensively into it.  I will notice that I suspect that
23   | Mr. Lombardi and Agent Pellegrino have not slept.
24   |          MR. JANSEN:  Okay.
25   |          THE COURT:  Is that correct?

| | |
|---|---|
| 1 | MR. JANSEN:  I think that's probably correct. |
| 2 | THE COURT:  And I know Agent Pellegrino has not. |
| 3 | MR. GLASER:  It is fair to say the government's |
| 4 | attorney has not slept, too. |
| 5 | THE COURT:  I have slept and Mr. Jansen has slept. |
| 6 | MR. JANSEN:  I have a three-year-old that kept me |
| 7 | from sleeping. |
| 8 | THE COURT:  Okay.  You do the best you can.  I will |
| 9 | notice that things were going on late at night and people |
| 10 | were tired. |
| 11 | BY MR. JANSEN: |
| 12 | Q.  Is it fair to say that Mr. Lombardi was cooperative while |
| 13 | you were questioning him for several hours? |
| 14 | A.  Yes, I would say that's a fair statement. |
| 15 | Q.  And did you, sir, take items away from the home based on |
| 16 | a search warrant? |
| 17 | A.  Items were seized; yes, sir. |
| 18 | Q.  Did you take anything that would have revealed any |
| 19 | bomb-making charts, graphs -- anything of that nature from |
| 20 | the home? |
| 21 | A.  Actually, sir, I have not yet had a chance to review the |
| 22 | evidence.  A search team at the home did that, and I have not |
| 23 | yet reviewed it.  I just haven't had time. |
| 24 | Q.  Did you fulfill your obligation in leaving a receipt for |
| 25 | items that were seized at the home? |

```
 1   A.  A receipt was left.  I was not responsible for doing so,

 2   nor have I actually read it yet.

 3   Q.  Okay.  Is it fair to say, by this point this morning,

 4   before this hearing, if any bomb-making information was on a

 5   computer or books, you would have been notified?

 6   A.  Well, the examination of all of the evidence takes time,

 7   specifically computer-type information, and I don't believe

 8   it's been completed yet.

 9   Q.  All right.  No physical books were taken?

10   A.  Books, like a manual, is that what you're asking?

11   Q.  Sure, a manual.

12   A.  I don't recall.  I didn't hear about any; no, sir.

13   Q.  Okay.  And did you find any gunpowder in the house?

14   A.  Again, sir, I didn't review the entire inventory.  I do

15   not -- I did not hear of any gunpowder being seized.

16   Q.  In paragraph 22, you talk about some cigarettes, and a

17   little match being found, but --

18   A.  Which paragraph?

19   Q.  Paragraph 22, you talk about the Benson -- the wife or

20   someone smoked Benson & Hedges cigarettes.

21   A.  Yes.

22   Q.  Seeing that you put that in there, wouldn't it be

23   consistent that, if somebody found firearms or any kind of

24   gunpowder, that would have also been included in here?

25   A.  That's correct, sir, it would have been.  The gunpowder,
```

1  I'm sure would have been, but there were firearms located

2  there.

3  Q.  Well, those were guns, correct?

4  A.  Pardon me?

5  Q.  Guns?

6  A.  Firearms, yes.

7  Q.  No explosives?

8  A.  No explosives that I know of; no, sir.

9  Q.  Is it fair to say that whatever device exploded at FAMU

10  on those two occasions would have required some type of

11  gunpowder?

12  A.  Some type of explosive, yes, sir.

13  Q.  All right.  Do you know if nitroglycerin was involved at

14  all, or do you know?

15  A.  I don't know, but I did not hear that.

16  Q.  Okay.  And when Mr. Lombardi was at Lowe's that day

17  purchasing those items, that, itself, was not illegal, was

18  it?

19  A.  The purchase of the items, they were legal items, if

20  that's the question; yes, sir.

21  Q.  How did he pay for such items?

22  A.  Cash.

23  Q.  Okay.  Did he in any way try to disguise himself at the

24  cash register in purchasing them?

25  A.  Not to my knowledge, no, sir.

1   Q.   Did he tell you about talking to Ralph Esposito about his

2   lawn problem?  Do you know who that is?

3   A.   Esposito, the garden center?

4   Q.   Yes.

5   A.   I remember him mentioning that; yes, sir.

6   Q.   Did you, in fact, interview Mr. Esposito to see if that

7   is actually true or not?

8   A.   No, sir.

9   Q.   Is your investigation done?

10  A.   No, sir.

11  Q.   You've talked about some gray bits being found at the

12  home and a sawblade being found in the home; is that correct?

13  That's in Paragraph Number 25.

14  A.   Actually, a one-eighth inch drill bit; yes, sir.

15  Q.   And you talked about a handsaw blade?

16  A.   And a handsaw blade, yes, sir.

17  Q.   Do those items -- have they been determined to be

18  involved with the devices found on FAMU campus?

19  A.   They are being examined as we speak.  I don't know the

20  results of that examination.

21  Q.   Okay.  Well, why is it, sir, then that you didn't put

22  that in paragraph 25, that these items, while seized, have

23  not been determined to be whether or not they are, in fact,

24  related?  I mean, you put that paragraph in there for what

25  purpose?

1   A.   Because the relevance of the residue that was on both of

2   those items, which is indicative of some involvement in these

3   crimes.

4   Q.   Cutting plastic doesn't necessarily put you at the FAMU

5   campus, does it?

6   A.   It certainly is not proof positive, sir; no, sir.  But,

7   certainly, it could be considered an indication.

8   Q.   Well, if that's the case, you would have a lot of people

9   to investigate in Tallahassee.

10            MR. GLASER:   Argumentative, Your Honor.

11            MR. JANSEN:   I'll withdraw the question, Your Honor.

12   BY MR. JANSEN:

13   Q.   Mr. Lombardi admitted being at Albertson's to purchase

14   some Crown Royal; is that correct?

15   A.   Yes, sir.

16   Q.   That's -- that was on September 22nd, 1999.  That's the

17   day of one of the events?

18   A.   That's correct.

19   Q.   And that's not, by itself, illegal to purchase Crown

20   Royal at 10:50?

21   A.   As long as you're over twenty-one.

22   Q.   And is Mr. Lombardi over twenty-one?

23   A.   So far as I know, yes, sir.

24   Q.   And have you determined that Mr. Lombardi was, in fact,

25   at the Albertson's at that time?

1  A.  Yes, sir, I think -- yes, sir.

2  Q.  And can you tell us what time did that device explode at

3  FAMU on September 22nd?

4  A.  My recollection is about approximately 10:30.

5  Q.  10:30.  And, again, you have no one placing him at the

6  FAMU campus, and he states he was at Albertson's, and you

7  have corroboration that he was at Albertson's.

8  A.  He was at Albertson's on September 22nd, yes, sir; that's

9  correct.

10  Q.  Now, the device that exploded at FAMU, how was it

11  designed to explode?  Was there a timer or was there a

12  mechanism?

13  A.  Again, the examination is not complete, certainly, on the

14  second device.  A preliminary report was given to me on the

15  first device.  And the first device is believed to have been

16  initiated with a hobby cannon fuse.  A hole was drilled into

17  the side of the PVC pipe, a fuse inserted, and a delay

18  mechanism was -- the fuse was lit and the device was

19  exploded.

20  Q.  How much of a delay mechanism was there?  Did they say?

21  A.  Well, again, it is preliminary, and so I'm a little

22  reluctant to say that's exactly the way it happened, because,

23  again, the information is preliminary.  But it is believed to

24  have been delayed by the use of a cigarette.

25  Q.  All right.  Now, on September 22nd, is it fair to say

1   that the FAMU campus had increased security by that point?

2   A.   Say that again?

3   Q.   Prior to the September 22nd explosion, was there an

4   increased explosion -- security?

5   A.   Well, I think there was an increased awareness.  I do not

6   know that there had -- in fact, I do know that there was not

7   the level of increased uniform presence on the campus.  That

8   occurred after the September 22nd incident.

9   Q.   Do you have any idea how these explosive devices were

10  carried onto the campus?  Any kind of material from the

11  device itself that would show what it was carried in?

12  A.   Not to my knowledge, sir.

13  Q.   And how big a device are we talking about, bigger than

14  that Kleenex box?

15  A.   Certain -- well, it is believed to have been consistent

16  with a ten-inch PVC nipple, which is virtually identical to

17  the one that Mr. Lombardi purchased on August the 30th.

18  Q.   The pipe is similar?

19  A.   Yes, sir, of a similar size.  I think the question was:

20  What size was it?  It was about the size of the pipe that

21  Mr. Lombardi purchased on August 30th.

22  Q.   Okay.  And did you do surveillance on Mr. Lombardi at

23  some point?

24  A.   There was a surveillance on Mr. Lombardi on -- I'm losing

25  track of days here -- yesterday.

1    Q.   All right.   And while you were surveilling him, did you

2    see him making any bombs?

3    A.   No, sir.   Again, I wasn't personally involved in the

4    surveillance, but I got no reports of observations of

5    Mr. Lombardi making bombs on yesterday's date.

6    Q.   Did you search his vehicle?

7    A.   That was listed in the affidavit.   I assume it was done.

8    I did not personally do it.

9    Q.   Is it fair to say that nothing was found in the vehicle

10   that would have -- of any consequence, otherwise it would be

11   in this affidavit?

12   A.   Nothing was brought to my attention for me to include it

13   in this affidavit.

14   Q.   All right.   You also indicated in your affidavit that

15   Mr. Lombardi had some kind of an identification card; is that

16   correct?

17   A.   Can you --

18   Q.   Paragraph 19.

19   A.   Okay.   I see that.   Yes, sir.   That was reported to us;

20   yes, sir.

21   Q.   And did you have that item listed as an item to be

22   searched for during the search warrant?

23   A.   I don't recall that one being specifically listed; no,

24   sir.

25   Q.   Well, did you find any kind of identification card from

1   his home?

2   A.   Again, sir, I haven't reviewed all of the evidence, but

3   no one has told me, so I can't say that it was.

4   Q.   Okay.

5        MR. JANSEN:   May I have a moment, Your Honor?

6        (Pause.)

7        MR. JANSEN:   If I may, Your Honor?

8   BY MR. JANSEN:

9   Q.   Paragraph 22, you mentioned Benson & Hedges cigarettes,

10  and I understand you may have seized a Coke can from the home

11  and interviewed Mrs. Lombardi regarding cigarettes; is that

12  correct?

13  A.   That's correct.   However, I personally did not interview

14  Mrs. Lombardi.   That was the information that I received.

15  Q.   Okay.   You place significance on the fact that some item,

16  some fragment containing the letter "B" was located

17  near FAMU; is that correct, paragraph 22, last sentence?

18  A.   It was located in the debris recovered from the blast

19  site; yes, sir.

20  Q.   Okay.   How close to the debris?

21  A.   How close to the debris?   It was part of the debris.

22  Q.   Okay.   Are you familiar with any other cigarettes that

23  start with the letter "B"?   Ever heard of a brand called

24  "Basic"?

25  A.   I don't smoke, but -- well, yeah, I take that back.   I've

1   seen them in magazines, sure, yeah, now that I think of it.

2   Q.  Do you know whether or not that "B" could have been from

3   a Basic cigarette?

4   A.  Do I personally?

5   Q.  Personally.

6   A.  No, sir.  Again, this was information that came from

7   laboratory examination.

8   Q.  When you initially started your investigation back in

9   August 31st, did it reach a point where it became a major

10  investigation?

11  A.  I think it became a major investigation right from the

12  get-go.

13  Q.  All right.  And when you started your investigation, did

14  you do any intelligence information from your database or

15  from ATF's database or the Tallahassee Police Department,

16  regarding individuals who may have prior records involved in

17  destructive devices or any kind of racial crimes?

18  A.  Absolutely.

19  Q.  And did you come up with a list of suspects?

20  A.  "Suspects" is rather a strong term.  We came up with a

21  list of individuals whose activities we wanted to look into.

22  Q.  Okay.  And did you look into those individuals?

23  A.  Yes, sir, we did.

24  Q.  How many individuals did you come up with, approximately?

25  A.  Educated guess, 30, 40.

```
 1   Q.  Is it fair to say that Mr. Lombardi was not on that list?

 2   A.  That initial list from the intelligence files?

 3   Q.  Yes.

 4   A.  No, sir, he was not.

 5   Q.  Is it fair to say that there is no evidence of any prior

 6   activity by Mr. Lombardi of this nature?

 7   A.  Not at this time, no, sir.

 8           MR. JANSEN:  No further questions.

 9           THE COURT:  Okay.  Any redirect?

10           MR. GLASER:  Yes, Your Honor, a few questions.

11                      REDIRECT EXAMINATION

12   BY MR. GLASER:

13   Q.  Mr. Pellegrino, you were asked on cross by defense

14   counsel about this trace-back, Star 69 trace-back.

15   A.  Yes.

16   Q.  Did any of these calls trace back to this defendant's

17   home?

18   A.  Home?  No, sir.

19   Q.  But they did trace back to other locations; is that

20   correct?

21   A.  Yes, sir, they did.

22   Q.  And these other locations included Albertson's?

23   A.  Yes, sir, the place where he was seen.

24   Q.  At or about the time the place where he was seen; is that

25   correct?
```

1    A.    That's correct.

2    Q.    And at or about the time that he admitted he was there?

3    A.    Yes, sir.

4    Q.    And this call-back situation also put him at or about the

5    scene of the tape that was transcribed pretty much in whole?

6              MR. JANSEN:   Objection to the form of the question,

7    Your Honor.

8              THE COURT:   Well, let's speed things up.  You may

9    answer that question.

10             MR. GLASER:   Thank you, Your Honor.

11   BY MR. GLASER:

12   Q.    I'm referring to paragraph 9, Special Agent Pellegrino,

13   the second phone call to Mr. Roberts that was transcribed,

14   taped and --

15   A.    Yes, sir.  I'm sorry.  The question -- I understand which

16   call you're talking about.  Now, what was the question?

17   Q.    Was there a star 69 on that as well?

18   A.    Yes, sir, there was, and there was a trace-back to the

19   K-Mart on Apalachee Parkway.

20   Q.    Not his home?

21   A.    No, sir, not his home.

22   Q.    But --

23   A.    It was a pay phone.

24   Q.    The K-Mart where he himself admitted he was, correct?

25             MR. JANSEN:   Objection, Your Honor.  This testimony

1   is not in this affidavit. It's leading the witness.

2              MR. GLASER: Oh, it is in the affidavit, Your Honor.

3              THE COURT: Just point to it. This is helpful to

4   me, and you may continue to lead the witness through the

5   affidavit. What section of the affidavit is this admission?

6              MR. GLASER: Your Honor, I take that -- paragraph

7   23, it indicates the individual, whose voice was recorded on

8   September 22nd, 1999, Mr. Lombardi admitted that was his

9   voice. That was a star 69 to the K-Mart, that conversation.

10  Mr. Lombardi admitted that that was his voice on the

11  audiotape that was traced back by 69 to the K-Mart. That was

12  my question. That's all.

13             THE COURT: It was in there. Okay.

14  BY MR. GLASER:

15  Q.  Access to FAMU, Special Agent Pellegrino, in fact,

16  Mr. Lombardi did have access to FAMU through his work as a

17  vendor there; is that correct?

18  A.  Yes, sir, for a period of time.

19  Q.  And he, in fact, had an identification -- a Florida A&M

20  University identification card with his name and picture on

21  it; is that correct?

22             MR. JANSEN: Objection, to the time of that

23  possession.

24             THE COURT: I'll let you recross on that, if it's

25  not established.

```
 1           MR. JANSEN:  Okay, that's fine.

 2           THE WITNESS:  Actually, I have not seen the

 3   identification card.  I have seen other identification cards

 4   that have photographs on it.  Whether his had a photograph on

 5   it or not, I know we had information provided to us that he

 6   was issued a Rattler I.D. card.  Again, I haven't seen it, so

 7   I can't say for sure that it had his picture on it.

 8   BY MR. GLASER:

 9   Q.  Has your investigation shown to this point that that card

10   was ever returned to FAMU after he was released in July of

11   this year?

12   A.  It was reported to me that it was not.

13   Q.  Finally, Special Agent Pellegrino, the two paragraphs --

14   I take it back.  It may not be found.  It was a long night,

15   though.

16           The "B" on Benson & Hedges, the conclusion that it was

17   consistent at this time with markings on Benson & Hedges,

18   that's at paragraph 22, that conclusion is a conclusion of

19   laboratory experts; is that correct -- as told to you?

20   A.  That's correct.

21   Q.  That's not necessarily your conclusion?

22   A.  No, no, sir.

23   Q.  Finally, Special Agent Pellegrino, at paragraph 9 of this

24   affidavit, it is the conversation reflected in this

25   transcript that Mr. Lombardi admits to being his voice on
```

1   that audiotape; is that correct?

2   A.   Yes, sir, he does.

3   Q.   And at least in part, this transcript reflects that

4   Mr. Lombardi said, "FAMU has just seen the beginning of this

5   shit"?

6   A.   Yes, sir.

7   Q.   And at the end of it, he ends, "And this is just the

8   beginning, brother"?

9   A.   Yes, sir.

10   Q.   And then there are other things included in there as

11   well.

12   A.   That's correct.

13   Q.   Mr. Lombardi didn't say, "This is Larry Lombardi," prior

14   to making this statement, did he?

15   A.   No, sir, not to my knowledge.

16   Q.   Nor any other statement?

17   A.   No, sir.

18           MR. GLASER:   That's all of the questions, I have.

19           THE COURT:   Very brief.

20                    **RECROSS-EXAMINATION**

21   BY MR. JANSEN:

22   Q.   The paragraph that we talked about in this transcript,

23   there is never anything talking about any bomb, is there, in

24   paragraph 9?

25   A.   Does he specifically mention a bomb in that conversation?

1   No, sir, he does not.

2   Q.   And he never mentions he's going to make a bomb and bomb

3   anybody, does he, in that conversation?

4   A.   I think the context or the conversation in context makes

5   it clear that's what he's talking about.

6   Q.   Well, let me ask you this:  There's no indication about a

7   bomb in there?

8   A.   There is no word "bomb" in there; yes, sir, I agree with

9   that.

10  Q.   And a person that calls up and claims responsibility or

11  says, "This is just the beginning," he may just be a person,

12  an outsider, watching these events go on; is that correct?

13  A.   Based on the proximity of the time of the call to the

14  time of the blast, not too many people would have known about

15  it.

16  Q.   But you did have other people call and make similar kind

17  of comments?

18  A.   Days and weeks later, yes, not within minutes.

19  Q.   In your experience, does a terrorist always call right

20  away and claim responsibility; or do they sometimes wait and

21  make the phone call?

22  A.   I don't know that there is any hard-and-fast rule, sir.

23  So, it's possible.

24  Q.   And the admission of the phone call itself does not show

25  that he made any bomb on the dates that he's been charged

```
 1   with?

 2   A.   Does it --

 3   Q.   It's not foolproof, a hundred percent, that he made any

 4   bomb at any time?

 5   A.   It's an indicator.

 6             MR. JANSEN:  Thank you for your honesty.

 7             No further questions.

 8             THE COURT:  Okay.  Take your seat.

 9             Any other evidence from the government?

10             MR. GLASER:  No, Your Honor.

11             THE COURT:  Does the defense want to put on any

12   evidence?

13             MR. JANSEN:  Not at this time, Your Honor.

14             THE COURT:  All right.  Is there any argument on

15   probable cause?

16             MR. JANSEN:  Well, Judge, I would argue for the

17   charge, specific charges that they have filed, that there is

18   no evidence that he, in fact, manufactured any item that's

19   not registered.  They can't put him on the FAMU campus.  In

20   fact, they put him away from the FAMU campus on the day that

21   one exploded.  They can't link him to buying anything but an

22   item that could have been purchased by anybody in this

23   courtroom, could have been bought by anybody outside of

24   Tallahassee.  The fact that he may have worked there at one

25   time, would have made him an easier target and seen at the
```

1    scene.

2    Judge, we know that Richard Jewel was originally

3    arrested and charged as a bomber in Atlanta, and that

4    investigation determined that it wasn't Richard Jewel.

5    What they've done here is they have charged him with

6    an offense, not of bombing FAMU, they charged him with making

7    a device that is not registered, and they can't even prove

8    that he made the device, and they can't even prove that he

9    was at FAMU.  It's strictly circumstantial.  He was not a

10   suspect of the 30 that they identified.  No prior history of

11   this individual.  He lived in the community for five years.

12   And it is not an indictment.  No grand jury has found

13   probable cause that he committed any offense.  This is based

14   on the information by this FBI agent along with other persons

15   giving him information.

16   I would argue, Judge, that they haven't satisfied

17   probable cause to this charge that's on there.

18   THE COURT:  Well, I think you've done a good job

19   with what you have.  I do find probable cause.

20   Anything further on the issue of detention?

21   MR. GLASER:  Your Honor, if I may?  I'm sorry.  Just

22   briefly on detention.

23   I wanted to ask for time to look at the pretrial

24   services report, Your Honor.  I would like to correct or

25   clarify things.

1                The Court has heard from testimony today that, in

2       fact, there were firearms located at the house.  I think, if

3       you look at the pretrial services report, that was not

4       reflected in there.  They were found there; and, in fact,

5       Mr. Lombardi would admit that there were firearms there, at

6       least last night, to Special Agent Pellegrino.

7                May I have a second?

8                THE COURT:  Where are you referring to on the

9       pretrial services report?

10               MR. GLASER:  I'm referring to the last paragraph

11      under A, Your Honor, where it says -- begins with "the

12      defendant and his attorney," at the bottom of the first page,

13      Your Honor.

14               THE COURT:  Okay.

15               MR. GLASER:  May I have just a second?

16               I have nothing further.

17               THE COURT:  Okay.  Defense?

18               MR. JANSEN:  Judge, if I may, on detention, this

19      is -- somewhere along the line someone mentioned a 20-year

20      sentence, and I reviewed the statute, and it is a ten-year

21      sentence for this charge.

22               More importantly, Judge, I've looked at the

23      guideline range.  The guideline range for the offense for

24      what this criminal complaint is is 33 months to 41 months as

25      we speak.

1        Now, if the federal government wants to indict him

2   for more serious charges, that's fine; but for the purposes

3   of detention today, the guideline range for my client would

4   be 33 to 41 months, and that's looking pessimistic, Judge, if

5   he was convicted of this offense.

6        My client, on the other hand, Judge, has no previous

7   criminal history.  He's not a convicted felon, and the fact

8   that he may or may not have had firearms in his home is of no

9   consequence.  There's no allegation that they were illegal

10  firearms, and I don't think there's any charges that these

11  firearms were not registered.  I don't believe that that's

12  the charge.  I think they're talking about an explosive

13  device.

14        I would like to correct the pretrial services

15  report, because it stated that, "The defendant and his

16  attorney declined to comment when asked if firearms were in

17  the residence."  That's not a true response.

18        I responded that, "If there were firearms in the

19  home, they would be removed," and I believe they have been

20  removed pursuant to a search warrant.  I want that to mean

21  that we did cooperate with the pretrial services.

22        Judge, two factors that you have to make a

23  determination on -- whether he's a risk of flight or danger

24  to the community.

25        I think it's very clear, Judge, he has two children

| | |
|---|---|
| 1 | that go to school in our public school system.  His wife is |
| 2 | here today, Judge.  She's employed by a corporation here. |
| 3 | She is here to show her support for her husband.  They have |
| 4 | lived in Tallahassee for over five years.  They recently |
| 5 | purchased a home with a mortgage.  They don't plan on going |
| 6 | anywhere. |
| 7 | My client cooperated that night when they came to |
| 8 | his home.  He answered some questions; and then, when they |
| 9 | got -- the questions started to turn, he decided to ask for a |
| 10 | lawyer, which he is allowed to do. |
| 11 | I would say that his ties to the community, Judge, |
| 12 | are clear that he's not a risk for flight. |
| 13 | Now, danger to the community, Your Honor, I asked |
| 14 | the pretrial services officer, and I asked her what |
| 15 | conditions we could satisfy the Court and to the community. |
| 16 | I think, obviously, the community wants to know whoever is |
| 17 | doing that, but they also want to make sure they've got the |
| 18 | right person, and we don't want to put the wrong person in |
| 19 | jail pending trial just because -- on a cursory look of some |
| 20 | circumstantial evidence, he may be involved or he made phone |
| 21 | calls, but we know other persons made some phone calls.  But |
| 22 | they want to take his liberty from him.  He's got no previous |
| 23 | history, no record. |
| 24 | I would ask, Judge, that the Court tailor some type |
| 25 | of a -- even if it's electronic monitoring to keep him home; |

1   that way the government would be clear that he will be at

2   home.   He'll have the monitoring device.   That monitoring

3   device is very specific.   If you leave the home, it will go

4   off.   He has the type of phone system.   Tallahassee pretrial

5   services has that type of capability.

6          I think, based on the fact that we only have a

7   complaint with a guideline sentence of 33 to 41 months, with

8   an individual with no previous history whatsoever, who's got

9   ties to this community; and, based on the evidence, the

10  circumstantial evidence, I think he's a candidate for

11  pretrial release.

12         My concern, Judge, is, if you put him in custody,

13  with the charges against him, he will be in more danger of

14  his own safety.   Because of the nature and because of the way

15  the community obviously feels, he would be at more danger --

16  there would be more danger to him in custody; that I think

17  that electronic monitoring him at home is the best.

18         Now, if he is indicted, a grand jury at some point

19  indicts him with more serious offenses and the guideline

20  range goes up, then I think the Court can then reconsider,

21  but right now you're looking at a person who may -- who

22  didn't register a firearm.   That's what he is charged with,

23  not registering a firearm in Washington.   That's what he's

24  charged with, and that's what the Court should determine the

25  bond on.

| | |
|---|---|
| 1 | THE COURT:  Government, anything further? |
| 2 | MR. GLASER:  Your Honor, in response, just very |
| 3 | briefly, I'll try not to take up a lot of the Court's time. |
| 4 | It's clear that what he's charged with is a crime of |
| 5 | violence.  There's court case law on that.  I can cite the |
| 6 | Court numerous cases that this is a crime of violence.  When |
| 7 | you look at the substance of the -- |
| 8 | THE COURT:  Are you saying technically that |
| 9 | possession of an unregistered firearm is a crime of violence |
| 10 | under the Bail Reform Act? |
| 11 | MR. GLASER:  I'm saying that, and the Court can look |
| 12 | behind, not only that, but look behind what's in the |
| 13 | affidavit -- |
| 14 | THE COURT:  Yes, I agree with you on that. |
| 15 | MR. GLASER:  -- as well and can consider that.  I'm |
| 16 | not sure where the defense -- |
| 17 | THE COURT:  That's a technical point, because there |
| 18 | is no presumption of detention in the case. |
| 19 | MR. GLASER:  Yes, exactly. |
| 20 | I'm not sure where the defense counsel comes up with |
| 21 | the guideline range.  I don't think -- as a matter of fact, |
| 22 | I'm sure -- he's not considered the adjustment for hate |
| 23 | crime, which also would play into this particular instance, |
| 24 | which would add considerable number of offense levels.  But, |
| 25 | again, I don't think that necessarily has any relevance. |

```
 1            I think that the affidavit is replete with the
 2   danger that this man poses to the community, based on his own
 3   actions, which he's admitted to, and based on actions which
 4   ties him to these bombings, Your Honor.  And I think that, as
 5   a danger, there is clear and convincing evidence that he is a
 6   danger to the community and would urge this Court to detain
 7   him prior to trial.
 8            THE COURT:  Okay.
 9            MR. JANSEN:  Judge, they're asking you to detain him
10   prior to him even being formally charged by the judicial
11   system of the United States.  A criminal complaint by an FBI
12   agent, they want to take his liberty from him.  A mere phone
13   call alone, Judge, is not sufficient.  A mere failure to
14   register a firearm is not a violent firearm, Judge.
15            Under 3142, we believe there are -- and this Court
16   has -- of course, you have a tough decision, Judge.  You've
17   got all these people back there that are going to report what
18   this Court did.  But that shouldn't matter, because the
19   justice department or the justice system says you are to be
20   blind to what the community calls for.  You are here to make
21   sure that he is going to be either here for trial, will
22   ensure that he comes to trial; and that he's not a danger to
23   the community.  And you have to look at, besides what's in
24   this affidavit, his previous criminal history, the evidence
25   against him, the nature of the charges against him.
```

1    And they have come forward with this failure to

2  register a firearm.  That's what they've come with, Judge.

3  If they had more serious charges and allegations, they would

4  have filed them, but they haven't.

5    THE COURT:  Well, it's all a piece.  I think the

6  charge is exactly what it technically is, and the underlying

7  part is the connection to a bombing at the campus.

8    I grant the motion for detention.  I think the

9  defendant has pointed up weaknesses in the proof that are

10  there.  But I reason that the phone call that was made, the

11  things that were said, connected with the buying of the pipe,

12  the other possibility for opportunity for being on FAMU

13  campus -- although, admittedly, there's no evidence that the

14  defendant was there -- the residue on the saw and on the

15  drill bit, connects the defendant to the bombing sufficient

16  for probable cause.

17    And then where the defendant is directly connected

18  to the phone calls by eyewitnesses and people who have

19  identified the voice who are familiar with his voice and his

20  own admission, and the things that were said in the phone

21  call connect together in a much stronger way and show me what

22  I have to find; and, that is, that there is, by clear and

23  convincing evidence, that there is a danger to the community,

24  and I so find.

25    I don't believe that I would be able to assure the

1   safety of the community by electronic monitoring in this

2   case.

3       I make no finding about risk of flight at this

4   point.

5       MR. JANSEN:  Judge, I would ask, on behalf of my

6   client, that the Marshal Service be directed -- or I'm sure

7   they will -- take all steps to separate him.

8       THE COURT:  Yes.  He will go to the FDC.  I'm

9   looking at David.  Be sure and alert -- now I'm looking at

10  the Marshal himself.

11      MARSHAL LOCKLEY:  Yes, sir.

12      THE COURT:  I don't need to say another word.

13      MARSHAL LOCKLEY:  Yes, sir.

14      THE COURT:  Thank you.  We will be in recess.

15      (The proceedings concluded at 4:10 p.m.)

16          *   *   *   *   *   *   *   *

17

18

19

20

21  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

22

23  _____          _10-13-99_
    Judy A. Ellan, RPR                  Date

24  Official U.S. Court Reporter

25