IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA,

v.                                                          Case No. 4:99cr71-RH/HTC

LAWRENCE LOMBARDI,

_Defendant._

_____/

UNITED STATES' SENTENCING MEMORANDUM

When Defendant Lawrence Lombardi came before this Court for sentencing in 2000, this Court had no choice but to impose a mandatory life sentence. As Lombardi comes back before this Court to be resentenced, there are no mandatory penalties, and the combined statutory maximum term for Counts One, Three, Five, and Six is 60 years. The guideline range remains 87 to 108 months, and Lombardi has been in custody for almost 21 years.

This Court is obligated to impose a sentence that is "sufficient, but not greater than necessary," to comply with the sentencing purposes enumerated in § 3553(a). These purposes include retribution ("to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment"), deterrence ("to afford adequate deterrence to criminal conduct"), incapacitation ("to protect the public from further crimes"), and rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.").

*See* 18 U.S.C. § 3553(a)(2). This Court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guideline range and any pertinent policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. *Id.* at § 3553(a)(1), (3)-(7).

Taken together, and even in the absence of § 924(c)'s mandatory consecutive penalties, the § 3553(a) factors demand a significant sentence in this case. The government asks that this Court keep in mind the following aggravating considerations when determining its sentence.

*A. The Nature and Circumstances of the Offenses Warrant a Substantial Sentence*

This Court's sentence must adequately "reflect the gravity of the defendant's conduct," which includes, from the public's perspective, "the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense." *United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008) (citing the legislative history of § 3553(a)). The harm caused by this offense was substantial, and it warrants an equally substantial sentence.

At approximately 12:45 p.m. on August 31, 1999, a pipe bomb went off in the first floor bathroom at Florida Agricultural & Mechanical University's Lee Hall. PSR ¶ 10. When University employee Bobby Lee Briggs entered the restroom shortly after the bomb went off, the bathroom was full of "thick white smoke from about elbow-level up" and there was "a burn mark down the wall" as well was "gray

2

plastic laying on the floor and gray plastic shrapnel sticking in two or three walls," and "debris all over the floor." Trial Trans. at 247-49, 253.[1] Sharon Saunders, another university employee who worked down the hall from the men's restroom, heard "a very, very loud explosion. It was so loud that we thought it was a gun, a gunshot." *Id.* at 261. Officer Dennis McIntosh recalled that "the light fixture above [the bomb] was damaged and broken and pieces were all over the floor," and that "pieces of plastic [had flown] over and chipped pieces of the wall" on the opposite side of the bathroom. *Id.* at 267.



---

[1] Citations to the trial transcripts (ECF Nos. 117, 118, 119, 120, & 122) refer to the court reporter's continuous pagination.

3

On September 22, 1999, at approximately 10:36 a.m., Captain Robert Cunningham, commanding officer of the University's Naval ROTC Unit, stopped by the men's restroom on the second floor of the Perry-Paige building, which houses the University's School of Agriculture. *Id.* at 276-77, 809. "Just as [he] was about to grab for the [door] handle, there was an explosion on the other side of the door." *Id.* at 276-77. The force of the explosion blew the door handle into Captain Cunningham's hands and "pushed both [his] eardrums in." *Id.* Captain Cunningham was "very fortunate that the door opened outward, because most of the blast fragments were basically shielded by the door." *Id.* His first response was to call for an ambulance because, "if anybody was inside [the bathroom], they would probably have been seriously hurt." *Id.* at 278. He recalled that he tried to go inside but "everything was all dark and smoke." *Id.* When he made it inside with flashlights, he recalled that "because of the implosion, everything more or less kind of went up and came down. The ceiling had dropped, light fixtures were dropped, most of the partitions for the urinals had been basically knocked about." *Id.* at 279. The bomb had virtually destroyed the commode.



As this Court surely recalls, each bomb was accompanied by racist phone calls to the media. These anonymous phone calls were designed to elicit terror in the Florida A&M community and made it plain that the bombings were motivated by racial bigotry. During the first call, Lombardi warned:

> Y'all better get on over to FAMU president's office, Lee Hall. I just told them I put a bomb in the building. I think I talked to the last white boy in there, and told them we need to get rid of some of these n*****s. They've just got a couple of minutes before the place to go sky high.

Trial Trans. at 381. The day of the Perry-Paige bombing, Lombardi placed two calls.

On the first, he stated:

> The only thing that n*****s know how to fix is turnip greens. Why the fuck do they need a school of agriculture at FAMU? Check it out.

*Id.* at 385. On the second call, Lombardi warned:

> FAMU has just seen the beginning of this shit.
>
> ****
>
> I'm warn … I'm telling you, these fucking n*****s … I've had enough of this God damn shit. They got no business having a college when there ain't nobody there smart enough to fucking get a degree in law or fucking whatever. They ain't smart enough to have a medical school or law 'cause nobody can pass the fucking test.
>
> ****
>
> And this is just the beginning brother.

PSR ¶ 17; Trial Trans at 389-90.

Five days after the Perry-Paige bomb, the Tallahassee Democrat printed articles about the bombings, including an article detailing a campus visit by Jesse Jackson, who urged the University not to be intimidated by the bomber. PSR ¶ 20; Trial Trans. at 742-43. That same day, Lombardi placed an anonymous call to the newspaper where he boasted that he had been thirty feet from Jackson and "could have taken him out." PSR ¶ 20. Lombardi closed the call with a warning that there were "a couple of events planned this week at FAMU." *Id.*; Trial Trans. at 740-42.

These were acts of violence and terror, motivated by Lombardi's deep-seated racism. *See infra* at 8-9. They were not done impulsively. These actions took careful planning and preparation, and we will never know whether there would have been

a third, fourth, or fifth bomb.

Although no one was physically injured by either bomb, both bombs were capable of causing injury and death. Trial Trans. at 939. People could have died. Had the Perry-Paige bomb gone off mere seconds later, it is likely that at least one University employee—Captain Cunningham—would have suffered significant injury or death. Importantly, Lombardi took no steps to minimize the risk of harm. Instead, he planted both bombs in public restrooms in the middle of the workday— a high traffic area at a high traffic time. Even if Lombardi did not act with the specific intent to kill or injure anyone, he was at best callously indifferent to the high risk of extreme physical harm.

The risk of physical harm is not the only type of harm that should be considered by this Court. The bombings were designed to and did in fact inflict significant psychological and emotional harm on the Florida A&M community:

> [T]he second bombing created fear throughout the entire university campus, because of the impact of it, the way it was described in terms of bringing the ceiling down in the bathroom and exploding one of the commodes into little pieces; and the head of our Naval ROTC being stunned, ears ringing as he attempted to open the door. Quickly through the whole campus, everyone began to see that this was obviously not a prank; that something very serious was going on, and people's lives were in danger. Students and parents started to panic.

Trial Trans. at 809-10 (testimony of Eddie Jackson, Vice President of University Relations). There were around 11,500 students at the University at the time, and approximately 400 students withdrew from the University that semester. *Id.* at 805,

810. Had there been a third bomb, the University would have had to shut down to keep the student body safe. *Id.* at 811. The government expects to have four representatives from the University speak to the continued harm at resentencing.

### B. Lombardi's Deep-Seated Racism

As far as the record is concerned, Lombardi led a relatively normal life prior to the bombings. But to those who knew him, there was a feature of his personality that stood out: Lombardi was openly racist towards Black people. In his recent letter to the Court, Lombardi denies that he was motivated by racial bigotry. Doc. 240-1. The evidence says otherwise.

During trial, Lombardi's friends, former co-workers, and a neighbor all testified that Lombardi had an overt dislike or even hatred of Black people and routinely used bigoted and offensive language. *See* Trial Trans. at 532-33, 537-39, 565, 570, 689-90, 704-08, 717, 731-33, 766-67. For example, one witness testified "a disregard or hatred" of Black people was a "repetitious issue" with Lombardi, that his dislike of Black people was "pretty intense," and that his comments "didn't seem like a joke." *Id.* at 704-05, 717. Another witnesses testified that Lombardi "had a very negative feeling towards [B]lack people" that was "[c]loser to the hate end of the continuum." *Id.* at 731. Two witnesses recalled incidents where Lombardi had tried to share racist propaganda from white supremacist websites with them. *Id.* at 520-27, 707-08, 715. Lombardi conveyed to one of these witnesses "you could get information from these same sites about how to make a bomb." *Id.* at 708. That

same witness also recalled an incident where Lombardi stated, in response to a joke about his stockpile of firearms and ammunitions, that "one day there's going to be a race war in this country, and I'm going to kill me some n*****s." *Id.* at 732-33. Two other witnesses recalled Lombardi sharing a story about how he had "fired several rounds into a car" of Black people celebrating after a Florida A&M football game. *Id.* 706, 719, 726-27. Lombardi's former neighbor testified that Lombardi hated servicing the vending machines at Florida A&M because it was "a [B]lack college" and Lombardi "doesn't like n*****s." *Id.* at 766-67. Several of these witnesses recognized Lombardi immediately when the third anonymous phone call was released to the public because they had heard Lombardi make similar if not identical comments before. *Id.* at 688, 699, 704, 768.

In light of this overwhelming evidence of Lombardi's prejudices, it is no surprise that an impartial jury of twelve unanimously concluded beyond a reasonable doubt that Lombardi was motivated by racism (resulting in the convictions on Counts Five and Six). And while there may be no law against holding or even expressing these toxic and hateful beliefs, substantial punishment is warranted when an individual chooses to manifest these beliefs into acts of terror and violence, as was done in this case.

### C. Aggravating Factors Not Considered By the Guidelines Range

Lombardi's guideline range for Counts One, Three, Five, and Six is 87 to 108 months, which is less than half the amount of time Lombardi has spent in custody.

But there is no presumption that a sentence within the guidelines range is reasonable. *Gall v. United States*, 552 U.S. 38, 50 (2007). Instead, this Court must "make an individualized assessment based on the facts presented," *id.*, and may impose a sentence significantly above the range so long as the sentence is supported by sufficient justification. *United States v. Irey*, 612 F.3d 1160, 1196 (11th Cir. 2010) (en banc). The Supreme Court has specifically rejected the argument that an extraordinary justification is required for a sentence outside the guidelines range. *Gall*, 552 U.S. at 47.

The guideline range in this case is based on an offense level of 24 under § 2K1.4(a)(1), because Lombardi knowingly "created a substantial risk of death or serious bodily injury to any other person." U.S.S.G. 2K1.4(a)(1); Doc. 124 at 15-18. Lombardi received a three-level adjustment under § 3A1.1(a) because he was motivated by racial prejudice. PSR ¶¶ 60, 68. Under the multi-count adjustment rules, the fact that there were two bombs raises the offense level by two, PSR ¶¶ 72-77, to total offense level of 29.

There are a number of aggravating factors that were not adequately taken into account in the offense calculation that warrant a substantial sentence far above the range. These factors include:

i.   The Nature of the Devices Used: the base offense level draws no distinction between the use of fire or any explosive material, *see* U.S.S.G. § 2K1.4(a)(1), and thus does not take into account the significance of the devices used (pipe

bombs);

ii. <u>Lombardi's Preparation and Planning:</u> nothing in the offense level calculation takes into account the planning and preparation that went into the offenses, which includes the construction of the pipe bombs;

iii. <u>The Targeting of a University:</u> although the guidelines provided for a three-level increase because the bombs were motivated by racial prejudice, the offense calculation does not reflect the aggravating fact that Lombardi targeted Florida A&M University, a historically Black public university serving thousands of Black and minority students;

iv. <u>The Racist Phone Calls:</u> nothing in the offense calculation takes into account the increased harm and terror elicited by the anonymous and racist phone calls made by Lombardi after the bombs, or the veiled threat of additional bombs;

v. <u>Multi-Count Adjustment:</u> the two-level increase in offense level under the multi-count adjustment does not adequately reflect the seriousness of the two bombings, including the fact that the second bomb was substantially more damaging than the first. This increase is equivalent to the enhancement for possessing more than three firearms, *see* U.S.S.G. § 2K2.1(b)(A)(1), yet the attendant harm from multiple bombings is far more substantial.

*D. There Remains a Strong Need for General and Specific Deterrence*

When Lombardi was sentenced in 2000, he told this Court that he was the

victim of an FBI conspiracy against him. Doc. 124 at 26-28. Now, after 20 years of imprisonment, Lombardi admits to committing the bombings but denies that they were motivated by racism or a hatred of Black people. Doc. 240-1. As discussed above, it is clear why Lombardi targeted Florida A&M University. Lombardi's denials cannot be reconciled with the evidence in this case or the jury's verdict. Moreover, that Lombardi has chosen to deny rather than denounce the beliefs that precipitated the bombings signals to the government that there is still strong need to protect the public through incapacitation and specific deterrence.

Even if this Court is not concerned with specific deterrence, there is a substantial need for general deterrence, which remains one of the "key purposes of sentencing." *See United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008) (quoting *United States v. Medearis*, 451 F.3d 918, 920-21 (8th Cir. 2006)). Every year, thousands of people are victims of crimes motivated by prejudice, most often racial prejudice. In recent years, the number of reported hate crimes has risen significantly.[2] This Court's sentence must send a strong message that acts of

---

[2] Pursuant to Congressional directive, the FBI collects yearly data about crimes motived by prejudice based on race, religion, sexual orientation, or ethnicity. The FBI's yearly data reports (from 1995) are available online at https://ucr.fbi.gov/hate-crime. The report reflects the following number reported hate crime incidents in previous years:

**2019:** 7,314 reported incidents, 55.8% of single-bias incidents motivated by racial bias
(https://ucr.fbi.gov/hate-crime/2019/topic-pages/incidents-and-offenses)

**2018**: 7,120 reported incidents, 57.5% of single-bias incidents motivated by racial bias
(https://ucr.fbi.gov/hate-crime/2018/topic-pages/incidents-and-offenses)

destruction and violence motivated by prejudice will not be tolerated and will be met with the most severe punishments available under the law.

*E. Unwarranted Sentencing Disparities*

This Court's sentence must also seek to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Although the maliciously damaging property offenses charged in Counts One and Three can no longer sustain Lombardi's now-vacated mandatory consecutive § 924(c) sentences on Counts Two and Four, Count Five and Six's convictions for interfering with federally protected activities by force or threat of force plainly qualify as "crimes of violence" under § 924(c)(3)(A)'s elements clause.[3] That is, this case involved "crimes of violence" as

---

**2017**: 7,175 reported incidents, 58.1% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/hate-crime/2017/topic-pages/incidents-and-offenses)

**2016**: 6,121 reported incidents, 57.5% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/hate-crime/2016/topic-pages/incidentsandoffenses)

**2015**: 5,850 reported incidents, 56.9% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/hate-crime/2015/topic-pages/incidentsandoffenses_final)

**2014**: 5,479 reported incidents, 47.0% of single-bias incidents motivated by racial bias (https://ucr.fbi.gov/about-us/cjis/ucr/hate-crime/2014/topic-pages/incidentsandoffenses_final)

[3] Specifically, § 245(b)(2)(A) states:

   (b) Whoever, whether or not acting under color of law, *by force or threat of force* willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

      (2) any person because of his race, color, religion or national origin and because he is or has been—

that term is defined in § 924(c), and had the government charged Counts Five and Six as the § 924(c) predicates for Counts Two and Four (or charged both sets of offenses as predicates), Lombardi would still be serving mandatory consecutive sentences of 30 years and life for the exact same conduct. If this case were so charged and prosecuted today, Lombardi would be sentenced to *two* mandatory consecutive sentences of 30 years under the First Step Act's changes to § 924(c). *See* First Step Act, § 403, Pub. L. No. 115-391, 132 Stat. 5221. Defendants convicted of similar crimes will serve no less.

Alternatively, defendants who have committed similar conduct may have instead been charged and convicted under 18 U.S.C. § 884(h) for "us[ing] fire or an explosive to commit any felony," which provides for a mandatory consecutive 10-year term of imprisonment on the first count and a mandatory consecutive 20-year term of imprisonment on the second count, "in addition to the punishment provided for such felon[ies]." Defendants convicted of crimes similar to Lombardi's will serve no less.

---

(A) enrolling in or attending any public school or public college;

…. and if bodily injury results from the acts committed in violation of this section or if such acts include *the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire* shall be fined under this title, or imprisoned not more than ten years, or both.

18 U.S.C. § 245(b)(2)(A) (emphasis added). Because Lombardi's convictions under this statute required the jury to conclude that he (1) injured, intimidated, or interfered with any person (or attempted to do so) "*by force or threat of force*" and (2) that these acts included "*the use, attempted use, or threatened use of dangerous weapon, explosives, or fire*," these convictions surely have as an element "the use, attempted use, or threatened use of physical force against the person" under § 924(c)(3)(A)'s elements clause.

The takeaway from this is that Congress has passed punitive, consecutive penalties for defendants, like Lombardi, who use explosives to commit serious offenses. And although those mandatory penalties may not be required in light of the unique posture of this case, this Court should consider the severity of the penalties imposed for substantively similar conduct as it fashions a just and fair sentence in this case.

## Conclusion

The government respectfully requests that the Court consider these points when resentencing Lombardi. Upon consideration, these factors should merit reimposition of a lengthy and substantial sentence to reflect the seriousness of the offenses, promote respect for the law, and to provide just punishment.

Respectfully submitted,

LAWRENCE KEEFE
United States Attorney

JORDANE E. LEARN
Assistant United States Attorney
Northern District of Florida
Florida Bar No. 117808
111 North Adams Street, 4th Floor
Tallahassee, FL 32301
(850) 942-8430
jordane.e.learn@usdoj.gov

CERTIFICATE OF COMPLIANCE

I certify that this response complies with Local Rule 7.1(F) U.S. District Court

for the Northern District of Florida. This notice contains 3,325 words.

*s/ Jordane E. Learn*
JORDANE E. LEARN
Assistant United States Attorney

CERTIFICATE OF SERVICE

I certify that one copy of the foregoing has been served electronically via

CM/ECF to Patricia Jean Kyle, appointed counsel for Defendant Lawrence

Lombardi, this 16th day of November 2020.

*s/ Jordane E. Learn*
JORDANE E. LEARN
Assistant United States Attorney
